UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS BLOWERS, Personal
Representative of the Estate of Andrew
Charles Blowers,

       Plaintiff,

v.

CITY OF BATTLE CREEK, et al.,

       Defendants.
_____/

Case No. 1:21-cv-376

Hon. Hala Y. Jarbou

## OPINION

Plaintiff Thomas Blowers brings this action under 42 U.S.C. § 1983 and state law on behalf of the estate of Andrew Charles Blowers (hereinafter, "Blowers"). Plaintiff sues the following defendants: the City of Battle Creek; James Blocker, the Chief of Police for Battle Creek; Battle Creek Police Officers Patrick Herson and Steven Herbstreith; the Board of Commissioners of Calhoun County; Steven Hinckley, Sheriff of Calhoun County; and Brandon Hatch, a deputy employed by Calhoun County. Before the Court is a motion to dismiss by Defendants Battle Creek, Blocker, and Herbstreith. The Court will grant the motion in part, dismissing the claims against these defendants.

## I. BACKGROUND

### A. Complaint

Plaintiff alleges that Blowers suffered from a "mental disability, including pervasive developmental delay, impulsivity, bipolar disorder, and mood disorder." (Compl. ¶ 14, ECF No. 1.) On the evening of September 5, 2020, Battle Creek Police Officers Ryan O'Connell and Patrick Herson attempted to stop Blowers "because [they] believed he was driving while under the influence." (*Id.* ¶ 15.) After O'Connell and Herson activated the lights and siren on their cruiser,

Blowers did not stop.  Instead, a "high-speed police chase ensued."  (*Id.* ¶ 16.)  Officer Herbstreith and Deputy Hatch joined the pursuit of Blowers in separate vehicles.

Blowers continued driving for several miles, followed by the police.  He eventually "lost control" of his vehicle and it "spun out" on a dead-end street, "momentarily stuck" in a ditch.  (*Id.* ¶ 17.)  O'Connell, Herbstreith, and Hatch stopped their vehicles nearby and approached Blowers's vehicle "with service revolvers drawn."  (*Id.* ¶ 18.)  Plaintiff alleges that "*[b]efore [Blowers's] vehicle began to move*, the officers saw his rear tires rotate and began to shoot him through the passenger side window of his vehicle."  (*Id.* ¶ 19 (emphasis added).)  These shots "mortally wounded" Blowers.  (*Id.* ¶ 20.)

In spite of his wounds, Blowers "accelerated out of the ditch, sideswiped a parked vehicle and drove at a low speed in the direction of dense wooded area[.]"  (*Id.* ¶ 21.)  As he did so, Herson, Herbstreith, and Hatch fired "more than 20 shots into the side and back of [Blowers's] vehicle.  (*Id.*)  Plaintiff alleges that "[t]he police officers and the deputy were not in harm['s] way and or were not otherwise without a means of escape from any potential harm presented by [Blowers's] moving vehicle."  (*Id.* ¶ 24.)  Also, Blowers did not possess a firearm or other weapon.

Blowers died at the scene.  A medical examiner determined that his cause of death was "multiple gunshot wounds that hit him in the back and right flank."  (*Id.* ¶ 25.)

## B. Video

Video footage of the incident supplied by Defendants reveals details that differ in significant ways from what Plaintiff alleges in his complaint.  The Court will construe this evidence in the light most favorable to Plaintiff.

### 1. O'Connell's Dashboard Camera

One video was taken from the dashboard camera of the police cruiser driven by O'Connell, who was accompanied by Herson.  (*See* Ex. 1 to Defs.' Mot to Dismiss, ECF No. 15-1.)  It shows

the "high-speed" chase of Blowers's vehicle that Plaintiff alleges in his complaint.  It begins with O'Connell and Herson's cruiser driving through a residential area at around midnight.  After a few turns, the video shows O'Connell following Blowers's vehicle, a black Chevy Trailblazer, for a few blocks.  Just before Blowers turned onto the entrance ramp for a four-lane divided highway, O'Connell activated his lights and siren.  Blowers continued driving without stopping or slowing down.  O'Connell followed.  The highway was mostly free of traffic, but Blowers occasionally changed lanes to swerve around vehicles and stay ahead of the police cruiser.  It is not clear from the video exactly how fast Blowers was driving (the video does not show the vehicle's speedometer).  Defendants assert that he drove over 90 miles per hour, but Plaintiff contends that Blowers drove "near the speed limit" at 75 miles per hour.  (Pl.'s Response Br. in Opp'n to Mot. to Dismiss 3, ECF No. 29.)  The video does show that Blowers passed a total of about nine vehicles traveling in the same direction.  At one point, Blowers cut across lanes in front of a tractor-trailer truck to take an exit ramp on the right side.  O'Connell followed him.

At the end of the exit ramp was a stop sign.  There was a vehicle ahead of Blowers as he approached the sign.  Blowers abruptly slowed down behind that vehicle and then cut around it by driving off the road and making a hard right turn at the intersection.  After the turn, Blowers accelerated down a two-lane road, picking up speed and crossing into the oncoming traffic lane to shortcut a leftward curve in the road.  Blowers then made several quick turns onto smaller roads in an area that appears to be unoccupied by houses or businesses.

When Blowers attempted to navigate a rightward curve in one of these roads at high speed, he lost control of his vehicle.  It went over the curb on the left side, spun around, and ended up with its headlights facing the road, sitting in a ditch among some trees and bushes about 10 to 15

feet from the road.  O'Connell parked his cruiser on an angle toward the left curb, near Blowers's vehicle, which was just out of view to the left of the frame when O'Connell's car stopped.

Within seconds, an officer crossed in front of the camera from the right side of O'Connell's cruiser with a pistol drawn and pointed in Blowers's direction.  That officer stepped over the curb and into the grass, shouting at Blowers and telling him to get out of his car.  A few seconds later, another officer (whom the parties identify as Officer Herbstreith) approached from the right side of the frame, looking toward Blowers's car.  Herbstreith stopped a few feet from the curb and then turned and stepped back out of view on the right, as if to avoid something.  Seconds later, Blowers drove his car out of the ditch and into the spot where Herbstreith was standing.  Blowers crashed into Herbstreith's police cruiser, which is out of view to the right of the frame.

### 2. Herbstreith's Dashboard Camera

The second video was taken from the dashboard camera of Herbstreith's cruiser.  (*See* Ex. 2 to Def.'s Mot. to Dismiss, ECF No. 15-2.)  Herbstreith joined O'Connell and Herson's pursuit of Blowers's vehicle, following them from behind until Blowers lost control of his vehicle. Herbstreith parked his vehicle near the left curb as they did, but in front and to the right of O'Connell's cruiser, partially blocking Blowers's escape.

The video from Herbstreith's cruiser shows his actions after he stepped out of view from the camera on O'Connell's cruiser.  About four seconds after his car stopped, Herbstreith enters into view from the left with his revolver in hand.  He stood for a moment in front of his cruiser, facing the direction of Blowers's car, and then turned around and quickly stepped out of view to the right, toward the passenger side of his cruiser.  About two seconds later, Blowers's car slammed into the front left side of Herbstreith's cruiser, spinning it to the right.  Blowers's vehicle then turned to the left and continued about 50 feet down the road until it reached the end, jumped a curb, and disappeared into some bushes.  Meanwhile, officers continued shooting at it.

### 3. Hatch's Body Camera

The last video comes from a body camera worn by Deputy Hatch.  (*See* Ex 3 to Def.'s Mot. to Dismiss, ECF No. 15-3.)  It shows that after Hatch parked, he stepped out of his cruiser and ran toward the passenger side of Blowers's vehicle, drawing his firearm and shouting at Blowers.  To Hatch's right, Herbstreith was standing in the road a few feet from the curb, within the path of Blowers's vehicle.[1]  As Hatch approached, Blowers's vehicle moved forward a few feet and then shots were fired.[2]  (For purposes of this motion, the Court will assume that Herbstreith is one of the officers who initially fired on Blowers.)  In the next four seconds, Blowers turned slightly to the left and then crashed into Herbstreith's cruiser, pushing its front end to the right and clearing a way for Blowers to escape.  Simultaneously with that collision, Herbstreith can be seen running out from behind his cruiser, away from the point of impact.

### C. Plaintiff's Claims

Count I of the complaint, which is titled "Excessive Force," asserts a claim against Defendants Herson, Herbstreith, and Hatch under 42 U.S.C. § 1983.  Plaintiff contends that these defendants deprived Blowers of his rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution by unlawfully seizing Blowers, using excessive force against him, depriving him of his life without due process, denying him equal protection of the law, and discriminating against him on this basis of a mental disability.

Count II asserts a claim under 42 U.S.C. § 1983 against Battle Creek, Chief Blocker, the Board of Commissioners of Calhoun County, and Sheriff Hinckley.  Plaintiff asserts that Battle

---

[1] The bodycam video is jittery and grainy, but several frames clearly show Herbstreith standing in a spot that Blowers's car passes through about two seconds later.  (*Cf.* Ex. 3 at 08:13-15 (showing Herbstreith near the curb) *with* Ex. 3 at 08:17-18 (showing Blowers's car in the same spot, headed toward Herbstreith's cruiser).)

[2] The bodycam video shows a bush being pushed over by Blowers's front wheel before the first shot is heard.  (Ex. 3 at 08:15.)

Creek and the Board of Commissioners maintained a "custom, policy, and practice" that caused Blowers to be deprived of his constitutional rights.  (Compl. ¶ 36.)

Count III asserts that Defendants Herson, Herbstreith, and Hatch committed assault and battery against Blowers.

Count IV asserts that Defendants Herson, Herbstreith, and Hatch were "grossly negligent" in the performance of their duties, giving rise to liability for all Defendants.  (*Id.* ¶ 45.)

Count V asserts that the actions of Defendants Herson, Herbstreith, and Hatch constitute intentional infliction of emotional distress ("IIED"), for which all Defendants are liable.

As relief, Plaintiff seeks damages and unspecified injunctive relief.

**D. Defendants' Motion**

Defendants Battle Creek, Blocker, and Herbstreith argue that the complaint fails to state a claim against them and/or that they are entitled to immunity.

## II. DISMISSAL STANDARD

A claim may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint under Rule 12(b)(6) must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### III. ANALYSIS

#### A. Officer Herbstreith

##### 1. Count I:  Excessive Force – § 1983

Plaintiff's federal claim against Officer Herbstreith contends that Herbstreith used excessive force against Blowers,[3] shooting at him before his vehicle started to move when there were no officers in harm's way, and then continuing to fire after Blowers attempted to drive away. Herbstreith argues that he is entitled to qualified immunity for this claim.

##### (a) Qualified Immunity

Qualified immunity shields public officials "'from undue interference with their duties and from potentially disabling threats of liability.'" *Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)).  It "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,'

---

[3] Although Blowers mentions due process and discrimination in Count I of his complaint, the crux of his claim is based on the use of excessive force in violation of the Fourth Amendment.  That is how Defendants construe the claim and Plaintiff does not argue otherwise.  Indeed, there are no allegations supporting a claim for discrimination or for the deprivation of due process in violation of the Fifth and Fourteenth Amendments.

'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

Plaintiff bears the burden of showing that Defendant is not entitled to qualified immunity. *See Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011). To do so, Plaintiff must show "(1) that [Defendant] violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (internal quotation marks omitted). "[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Id.*

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that every reasonable official would know.

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (citations and quotation marks omitted). It is not necessary for there to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590.

> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct *in the particular circumstances before him*. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity. We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established.

*Id.* (citations and quotation marks omitted; emphasis added). "Notice to officials is paramount; 'the salient question' in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was [unlawful]." *Guertin*, 912 F.3d at 932 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Dismissing a case on the basis of qualified immunity at the motion-to-dismiss stage is "generally inappropriate." *Id.* at 917 (quoting *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015)). As the Court of Appeals has explained:

> The assertion of qualified immunity at the motion-to-dismiss stage pulls a court in two, competing directions. On the one hand, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotation marks omitted). But on the other, "[w]hen qualified immunity is asserted at the pleading stage," as defendants did here, "the precise factual basis for the plaintiff's claim or claims may be hard to identify." *Id.* at 238-39 (citation omitted). We have thus cautioned that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although . . . entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) (internal citations, quotation marks, and brackets omitted). The reasoning for our general preference is straightforward: "Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious' or 'squarely governed' by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not" for purposes of determining whether a right is clearly established. *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005)[.]

*Id.*

Nevertheless, dismissal is appropriate here because the relevant facts are apparent from video and audio footage of the incident. That footage makes the factual basis for Plaintiff's claim clear. Moreover, the Court can consider that footage at the motion-to-dismiss stage because it "'utterly discredit[s]' [Plaintiff's] version of events and allows [the Court] to ignore the 'visible fiction' in his complaint." *Bailey v. City of Ann Arbor*, 860 F.3d 382, 386-87 (6th Cir. 2017) (quoting *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)).

The most glaring fiction in Plaintiff's complaint is his assertion that officers fired on Blowers *before* his vehicle started moving.  The video and audio from Herson's body camera clearly show otherwise.  Officers began firing *after* Blowers started accelerating out of the ditch.

Another fiction is Plaintiff's assertion that no officers were at risk of harm when Blowers attempted to escape from the ditch.  In fact, all the videos confirm that Herbstreith was standing within the path of Blowers's vehicle when it started moving.  He may not have been standing in a straight path ahead of the vehicle, but he was clearly at risk.  He was in the path that Blowers used. And although Herbstreith had just enough time to move behind his cruiser before the collision, he was still at risk.  The impact caused the front of the cruiser to spin in his direction.

In addition, the videos provide significant details about the nature of Blowers's reckless driving and the risks he posed to the public when officers were attempting to stop him.  All these facts are relevant to assessing Herbstreith's eligibility for qualified immunity.  And in light of these facts, Plaintiff's claim fails on the second prong of the qualified-immunity analysis because Herbstreith did not have fair notice that his actions violated Blowers's constitutional rights.

### (b) General Principles Regarding the Use of Deadly Force

A law-enforcement officer's use of force to effect a seizure "is governed by the Fourth Amendment's 'reasonableness' standard."  *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  That standard "'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'"  *Id.* (quoting *Graham*, 490 U.S. at 396).

Generally, an officer may not use deadly force unless he or she "'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]'" *Gordon v. Bierenga*, --- F.4th ---, No. 20-2013, 2021 WL 5905662, at *4 (6th Cir. Dec. 14, 2021)

(quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).  Whether the use of force is excessive "depends on 'the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Id.* (quoting *Graham*, 490 U.S. at 396).  The Court must look at the "totality of the circumstances" "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Plumhoff*, 572 U.S. at 775 (quoting *Graham*, 490 U.S. at 396).  This standard allows "'for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"  *Id.* (quoting *Graham*, 490 U.S. at 396-97).

"However, outside of the obvious case, [the] general principles established in *Garner* and *Graham* cannot establish clearly established law."  *Gordon*, 2021 WL 5905662, at *4 (quotation marks omitted).  Defendant is entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)).  "[S]pecificity is especially important in the Fourth Amendment context" because "'[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'"  *Mullenix*, 577 U.S. at 12 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

In cases involving "use of deadly force during vehicular flight," the "critical question" is "'whether the officer has reason to believe that the [fleeing] car presents an imminent danger to officers and members of the public in the area.'"  *Gordon*, 2021 WL 5905662, at *4 (quoting *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014) (internal quotation marks and citation omitted)).  "Deadly force is justified against 'a driver who objectively appears ready to drive into

an officer or bystander with his car.'"  *Id.* (quoting *Cass*, 770 F.3d at 375).  "Deadly force is generally not justified 'once the car moves away, leaving the officer and bystanders in a position of safety[,]' but an officer may 'continue to fire at a fleeing vehicle even when no one is in the vehicle's direct path when the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car.'"  *Id.* (quoting *Cass*, 770 F.3d at 375) (internal quotation marks and citation omitted).  Thus, the Court "must look both to whether anyone was in the car's immediate path at the time of the shooting and to the officer's prior interactions with the driver that show potential for 'imminent danger to other officers or members of the public in the area' if the driver is permitted to continue fleeing."  *Id.* (quoting *Latits v. Phillips*, 878 F.3d 541, 549 (6th Cir. 2017)).

### (c) Relevant Cases Involving the Use of Deadly Force

The Supreme Court has considered the use of deadly force after a high-speed car chase on several occasions, most recently in *Mullenix v. Luna*, 577 U.S. 7 (2015).  There, the decedent fled police officers after they approached his car and informed him that he was under arrest.  *Id.* at 8. He led them on an "18-minute chase at speeds between 85 and 110 miles per hour."  *Id.*  Twice, he called the police dispatcher, claimed that he had a gun, and threatened to shoot at officers if they did not abandon their pursuit.  Although other officers had placed a spike strip in the road to stop the decedent, Officer Mullenix fired six shots at the decedent's car in an attempt to disable it before the decedent reached the strip.  Those shots struck the decedent, killing him.  *Id.* at 9.  A lawsuit followed, claiming that Mullenix had used excessive force in violation of the Fourth Amendment.

According to the Court, "Mullenix confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at Cemetery

Road." *Id.* at 13. For purposes of qualified immunity, "[t]he relevant inquiry [was] whether existing precedent placed the conclusion that Mullenix acted unreasonably 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). After surveying the case law, the Court noted that "excessive force cases involving car chases reveal[ed] the hazy legal backdrop against which Mullenix acted." *Id.*

For instance, in *Brousseau v. Haugen*, 543 U.S. 194 (2004), the Supreme Court had held that it was not clearly established that an officer would violate the Fourth Amendment by shooting at "a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* at 200.

And in *Scott*, the Court had held that an officer "did not violate the Fourth Amendment by ramming the car of a fugitive whose reckless driving 'posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase.'" *Mullenix*, 577 U.S. at 310 (quoting *Scott*, 550 U.S. at 384).

Also, in *Plumhoff*, the Court had held that officers acted reasonably when using deadly force to end a high-speed car chase that put the lives of others at risk. 572 U.S. at 777. According to the Court, "a 'police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment.'" *Id.* at 776 (quoting *Scott*, 550 U.S. at 386).

In *Plumhoff*,

the chase . . . exceeded 100 miles per hour and lasted over five minutes. During that chase, [the decedent, Donald Rickard,] passed more than two dozen other vehicles, several of which were forced to alter course. Rickard's outrageously reckless driving posed a grave public safety risk. And while it is true that Rickard's car eventually collided with a police car and came temporarily to a near standstill, that did not end the chase. Less than three seconds later, Rickard resumed maneuvering his car. Just before the shots were fired, when the front bumper of his car was flush with that of one of the police cruisers, Rickard was obviously pushing

down on the accelerator because the car's wheels were spinning, and then Rickard threw the car into reverse "in an attempt to escape." Thus, the record conclusively disproves respondent's claim that the chase in the present case was already over when petitioners began shooting. Under the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road. Rickard's conduct even after the shots were fired—as noted, he managed to drive away despite the efforts of the police to block his path—underscores the point.

*Id.* at 776-77.

Against this legal backdrop, the Court in *Mullenix* concluded that the officer was entitled to qualified immunity because the law did not clearly establish that his use of deadly force was unreasonable under the circumstances he faced. *Mullenix*, 577 U.S. at 18-19.

Defendants cite a Court of Appeals decision that reached a similar result: *Hocker v. Pikeville City Police Department*, 738 F.3d 150 (6th Cir. 2013). In that case, Charles Hocker led officers "on a highspeed (70 to 80 miles per hour), nighttime chase (without his headlights on) down a winding back road, imperiling the safety of anyone driving in [his] vicinity." *Id.* at 154. After he stopped, Hocker "rammed" an officer's cruiser while that officer was standing behind the cruiser's open door, pushing the car thirty feet. *Id.* That collision "temporarily trapped" the officer's arm between the door and body of the cruiser and forced another officer to "backpedal" to avoid the sliding cruiser. *Id.* After those events occurred, the officers fired at Hocker and his vehicle.

The court concluded that the officers' actions were reasonable, even though Hocker argued that "neither one of them was in harm's way" at the moment they began shooting. *Id.* at 155. The court noted that the each of the officers could act to protect the other and the public, even if each officer knew that he was not personally at immediate risk.

It is not that easy, particularly in the context of the lightning-quick evolution of this encounter. It is undisputed that neither officer knew where the other one was when they began firing. That one officer was safe does not mean the other one was. This

14

reality by itself justified the officers' conduct.  While it may be easy for Hocker to say that each officer was safe once the officer was no longer in the direct path of Hocker's vehicle, no reasonable officer would say that the night's peril had ended at that point.  Hocker remained in the car, and for the prior ten minutes or so—from the officers' reasonable perspective—had put others, including most recently the officers, in harm's way with his car.  What in that short time span would leave anyone with the impression that Hocker no longer presented a threat to their safety? He remained in the car, and the car engine remained on.  Only Hocker's self-restraint stood in the way of further threats to their safety. From the officers' reasonable perspective, the peril remained.

*Id.*

Similarly, in *Gordon*, the Court of Appeals recently held that an officer was entitled to qualified immunity for using deadly force to stop a vehicular escape because the case law did not clearly establish that his conduct was unconstitutional.  There, the decedent, Antonino Gordon,

> fled from [Officer Bierenga] during rush hour in the middle of a major road in a populated Detroit suburb, adjacent to residential neighborhoods and businesses. Bierenga observed Gordon make a reckless left turn in the face of oncoming traffic near a busy intersection to escape from Bierenga, causing oncoming cars to brake to avoid colliding with Gordon as he turned into the White Castle parking lot. Several cars were parked in the parking lot.  Multiple patrons and employees were inside.  What's more, after Bierenga later blocked in Gordon at the drive-thru window, Gordon reversed into the occupied vehicle behind him before accelerating forward and hitting Bierenga's police vehicle.  Although Gordon's contact with those vehicles occurred at a relatively low speed, his conduct showed a willingness to strike both police and civilian vehicles to effectuate his escape from police.

*Gordon*, 2021 WL 5905662, at *5.

Bierenga fired at Gordon while positioned to the side of Gordon's vehicle, after Gordon accelerated and attempted to flee through an opening behind Bierenga's cruiser.  In other words, neither Bierenga nor a bystander were in immediate danger when Bierenga shot Gordon. Nevertheless, given Gordon's willingness to strike other vehicles to make his escape and the "time and place at which [his actions] occurred" (i.e., a busy and populated area), the case law did not clearly establish that Bierenga's conduct was unconstitutional because permitting Gordon to continue fleeing would "potentially endanger the public."  *Id.* at *5.

**(d) Plaintiff's Arguments Opposing Qualified Immunity**

Plaintiff relies on the district court decision that was *overruled by Gordon* to argue that Herbstreith is not entitled to qualified immunity. The district court concluded that Bierenga was not entitled to qualified immunity for his actions; however, the Sixth Circuit held otherwise. Thus, the district court's decision does not aid Plaintiff's argument.

Plaintiff also relies on cases discussed by the district court in the *Gordon* case, particularly *Latits* and *Godawa v. Byrd*, 798 F.3d 465 (6th Cir. 2015). Those cases are distinguishable. In *Godawa*, a police officer stopped Michael Godawa in the parking lot of a restaurant after someone reported that Godawa had been drinking and was underage. *Godawa*, 798 F.3d at 461. The officer, who was on bicycle patrol, obtained some information from Godawa and then returned to his bicycle to call for backup to conduct a field sobriety test. While the officer was standing by his bicycle, Godawa started his car and backed it out of its parking space, hitting or knocking over the officer's bicycle. The officer told Godawa to stop, but he did not do so. The officer then drew his firearm and ran alongside the vehicle toward the front, ordering Godawa to stop the car. Godawa's vehicle apparently came into contact with the officer, though the parties disputed how that occurred. A video of the incident showed that "[i]n the seconds leading up to the impact, [the officer] can be seen ahead and to the right of the front passenger side of Godawa's car." *Id.* at 461. As the car pulled forward the officer approached the car, but the moment of impact was not captured on the video. Thus, it was not clear from the evidence whether Godawa intentionally "targeted" the officer or whether the officer stepped in front of the car to stop Godawa from fleeing. *Id.* at 463. The officer claimed that Godawa's car hit him in the leg, but the officer quickly regained his balance. He then took three steps and fired shots through the back passenger window of Godawa's car, killing him from behind.

16

According to the court, a jury could reasonably conclude from the evidence that Godawa "never attempted to hit [the officer] and did not drive in a manner that endangered [the officer's] life." *Id.* at 465.  Instead, the officer actively put himself in a dangerous position to try to block Godawa's escape.  And by the time the officer fired his weapon, he had no reason to fear being struck by the car or to believe that others were at risk.  *Id.* at 466.  The court distinguished *Scott* and *Plumhoff* because those cases involved "fleeing driver[s] . . . imperiling the lives of officers or the public," where it is "generally . . . objectively reasonable for a police officer to employ deadly force to end the flight."  *Id.* at 467.

Plaintiff's case is more like *Gordon*, *Scott*, and *Plumhoff* than *Godawa*.  Unlike Godawa, Blowers gave Herbstreith ample reason to believe that he posed a risk to his own safety and to the safety of others.  Blowers led them on an eight-minute, high-speed car chase during which he passed multiple vehicles.  He stopped momentarily only because his reckless driving caused him to lose control of his vehicle and lodge it in a ditch.  And despite clear commands to get out of his vehicle, he accelerated toward where Herbstreith was standing, giving Herbstreith reason to believe that his own safety was at risk.  Then, after crashing into Herbstreith's cruiser, Blowers drove off under continued gunfire, apparently intent on resuming his flight and potentially putting others at risk.  *Godawa* did not involve a dangerous car chase or an officer at risk when the shooting occurred.  Thus, it does not squarely govern this case.

In *Latits*, a police officer stopped Laszlo Latits shortly after midnight for driving the wrong way on a divided boulevard.  *Latits*, 878 F.3d at 544.  After approaching Latits, the officer thought he saw drugs in the vehicle, so he told Latits to get out of his car.  Instead of complying, Latits drove away.  The officer ran back to his cruiser and pursued Latits for two minutes to an empty parking lot.  Latits steered away from the officer's car to avoid a collision and then fled down a

divided highway for about 30 seconds at about 60 miles per hour.  *Id.* at 545.  Several officers followed him in different cars.  There were no pedestrians or other cars visible in the area, which was bounded by a cemetery, a commercial zone, and a vacant fairgrounds.  When Latits attempted to make a U-turn, the officer behind him collided with his vehicle, causing Latits to lose control. Latits's car briefly swerved back and forth and then regained control.  A few seconds later, another officer rammed Latits's car from behind, forcing it to spin out into the grass.  Several officers positioned their cars nearby to prevent Latits from escaping.  Latits slowly drove forward and then another officer moved his car in the way to block him.  Their vehicles collided.  Around the same time, Officer Phillips jumped out of his cruiser and ran to the side of Latits's car.  Latits slowly moved his car in reverse.  No cars or officers were immediately behind him.  Phillips followed Latits and then shot him from the front, killing him.

The court concluded that Phillips had not acted reasonably.  No officers were in imminent danger when he shot Latits because there was no one in Latits's path at the time.  And viewing the video evidence in the light most favorable to the plaintiff, Latits's slow collision with a police vehicle revealed only "intent to flee, not intent to injure officers."  *Id.* at 550.  Also, the public was not in danger because "[t]he chase occurred under circumstances in which risk to the public was relatively low."  *Id.* at 550.  "Latits had fled at no more than sixty miles per hour down an almost entirely empty ten-lane divided highway at night," passing "only one parked car."  *Id.* at 549.  "No other pedestrians, cyclists, or non-police cars were visible [during the chase]," and the surrounding area was not populated.  *Id.*

Unlike Latits, Blowers led officers on a high-speed chase past multiple vehicles.  Also, Herbstreith was standing in Blowers's escape path when Defendants fired on him, and Blowers turned his vehicle in Herbstreith's direction, suggesting that he was willing to injure an officer in

18

order to make his escape.  Thus, the *Latits* case does not squarely govern these circumstances either.

The same logic applies to other cases in which the defendant shot the decedent from the side or from behind when no officers were in harm's way at the time.  *See, e.g.*, *Sigley v. City of Parma Heights*, 437 F.3d 527 (6th Cir. 2006); *Hermiz v. City of Southfield*, 484 F. App'x 13 (6th Cir. 2012).  Those were not the circumstances faced by Herbstreith and the other officers when they started firing on Blowers.  Thus, those cases did not put every reasonable official in Herbstreith's position on notice that his actions were unconstitutional.

It is true that no officers were in immediate danger after Blowers collided with Herbstreith's cruiser.  To the extent Plaintiff argues that Herbstreith was not justified in continuing to shoot at Blowers as he drove away, Plaintiff's claim fails because Herbstreith had reason to believe that Blowers continued to pose a threat to the public based on his actions toward Herbstreith and his actions during the police chase.  *See Cass*, 770 F.3d at 375 (noting that "[a]n officer may . . . continue to fire at a fleeing vehicle even when no one is in the vehicle's direct path when 'the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car.'" (quoting *Hermiz*, 484 F. App'x at 16)).  At the very least, the law did not clearly establish that Herbstreith's actions here were unconstitutional.

Plaintiff insists that a jury could interpret the video evidence as showing that Blowers's actions after the collision were "involuntary physical movements" resulting from his initial gunshot wounds and, thus, there was no need to continue shooting at him while he drove forward "at low speed into a wooded thicket at the end of the road."  (Pl.'s Response Br. 14.)  Plaintiff contends that the video "does not show any acceleration or steering activity" after the collision. (*Id.*)

Plaintiff is mistaken.  Herbstreith's dashcam video shows that Blowers made a slight left turn after the collision and then his vehicle straightened out, which is not consistent with involuntary movement.  And in any case, Plaintiff ignores the rule that, in rapidly-evolving situations like the one here, "an officer does not violate the Fourth Amendment where, although ultimately wrong in his or her assessment of the circumstances, 'a dangerous situation evolved quickly into a safe one before the police officer had a chance to realize the change.'"  *Cass*, 770 F.3d at 376 (quoting *Smith v. Cupp*, 430 F.3d 766, 774-75 (6th Cir. 2005)).  Indeed, if Blowers was already incapacitated when he continued down the street away from the collision, Herbstreith could not have known it.

Plaintiff faults Herbstreith for parking his vehicle in front of O'Connell's vehicle and then approaching Blowers's vehicle from the front, despite the fact that Battle Creek policy required Herbstreith to serve as a backup for other officers at the scene.  (*See* Battle Creek Police Department Policy 307.5.4, ECF No. 29-6.)  However, nothing in the policy expressly prohibited Herbstreith from parking or standing where he did.  Thus, Plaintiff's reliance on the policy is misplaced.  Moreover, this case is not like *Godawa*, where a jury could construe the evidence as showing that an officer actively put himself in harm's way.  Here, the video shows that Blowers's car was not moving when Herbstreith approached the curb.  It also shows that, after Blowers began moving, Herbstreith ran away from Blowers's vehicle; he did not use his body to stop Blowers's escape.

In summary, Plaintiff's arguments against qualified immunity are not persuasive.  In light of the indisputable facts depicted in the video footage, Plaintiff has not shown that it was clearly established that Herbstreith's conduct violated Blowers's constitutional rights.

## 2. Count III: Assault and Battery

Plaintiff also asserts claims for assault and battery under state law.  Herbstreith argues that he is entitled to governmental immunity for these claims under Mich. Comp. Laws § 691.1407, which "grants immunity to governmental employees from intentional-tort liability to the extent allowed by the common law before July 7, 1986."  *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 218 (Mich. 2008).  Governmental immunity is an affirmative defense requiring the defendant-employee to establish that

> (1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature.

*Id.*

Plaintiff responds that immunity is not available for governmental employees whose conduct amounts to "gross negligence."  Michigan's governmental tort liability statute contains an exception for an employee's conduct that "amount[s] to gross negligence."  Mich. Comp. Laws § 691.1407(2)(c).  That exception, however, only applies to "*negligent* tort liability."  *Odom*, 482 N.W.2d at 470.  Thus, it does not apply to intentional torts like assault and battery.

Plaintiff also contends that granting immunity would be premature without discovery.  The Court disagrees.  The only issue that would potentially be in dispute is whether Herbstreith acted in good faith.  An act is not taken in good faith if the employee acts "'maliciously or with a wanton or reckless disregard of the rights of another.'"  *Radu v. Herndon & Herndon Investigations, Inc.*, 838 N.W.2d 720, 733 (Mich. Ct. App. 2013) (quoting *Odom*, 760 N.W.2d at 225).  "'[W]illful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does.'"  *Id.* (quoting *Odom*, 760 N.W.2d at 225).

21

Here, the state-court version of the *Latits* case is instructive.  *See Latits v. Phillips*, 826 N.W.2d 190 (Mich. Ct. App. 2012) ("*Latits II*").  There, the Michigan Court of Appeals held that Officer Phillips was entitled to governmental immunity for Latits's claims for assault and battery because the issue was not whether Phillips's actions were "objectively reasonable" but whether he had a "good-faith belief that he was acting properly in using deadly force[.]"  *Id.* at 194.  "What is relevant was whether defendant, in good faith, believed that he needed to fire his weapon to protect himself and others."  *Id.* at 195.  Phillips testified that his reason for shooting Latits was "to ensure his safety and the safety of others," and no evidence disputed that reason.  *Id.* at 194-95.

Similarly, the video evidence here provides indisputable support for a good-faith belief by Herbstreith that he and others were in danger.  Although Herbstreith has not testified about his subjective perception of the need to use force to protect himself or others, those perceptions are clear from his actions in the video.  Herbstreith followed Blowers on the high-speed car chase that ended with Blowers's vehicle in a ditch.  As Herbstreith approached Blowers's car, it was surrounded by officers pointing their weapons at Blowers, telling him to get out of his vehicle.  Herbstreith then had to flee from his position in order to avoid being run over by Blowers.  Herbstreith narrowly escaped injury even though he was behind his cruiser when Blowers collided with it.  Thus, Herbstreith fired on Blowers when it was clear to Herbstreith that Blowers would not stop for armed police and was willing to put others at risk in order to continue his escape.  In these circumstances, Herbsreith is entitled to governmental immunity.  Thus, the Court will grant Defendants' motion to the extent it seeks to dismiss Plaintiff's claim for assault and battery.

### 3. Count IV: Gross Negligence

Plaintiff alleges that Herbstreith was grossly negligent by breaching the following "duties" owed to Blowers:

a. The duty to use verbal means such as advice, warning or persuasion before resorting to deadly force;

b. The duty to refrain from using deadly force where force was not necessary;

c. The duty to exhaust all reasonable alternatives before using deadly force, including but not limited to requesting assistance and/or backup before utilizing force as a means of coercion;

d. The duty to use only such force as was necessary and reasonable under the circumstances;

e. The duty to exercise restraint in difficult situations and to analyze the situation and react in a professional manner, employing restraints, tactics, and strategies in use by law enforcement agencies when handling citizens with mental disabilities.

f. Other duties to be identified.

(Compl. ¶ 44.)

Defendants argue that Plaintiff does not state a claim against Herbstreith for gross negligence because Plaintiff's allegations are premised on intentional conduct, not negligence. And in the alternative, Defendants argue that Herbstreith is entitled to governmental immunity for this claim.

Again, *Latits II* is instructive. The plaintiff in that case also raised a claim for gross negligence. He alleged that Phillips was grossly negligent for failing to follow police procedure and for "recklessly" firing his gun at Latits. *Latits II*, 826 N.W.2d at 196. However, the court concluded that "[t]he gravamen of plaintiff's claim against defendant is that he *intentionally* and improperly shot Latits." *Id.* at 197 (emphasis added). No allegations suggested that Phillips recklessly or unintentionally fired on Latits. "Furthermore, the claim that defendant failed to appreciate that Latits did not pose a risk of harm may have [had] some bearing on whether defendant made the proper decision to shoot, but it [did] not alter the fact that it was an *intentional* decision to shoot." *Id.* at 196 (emphasis added). In short, the plaintiff's claim was "one of

intentional tort, and no amount of artful pleading [could] change that fact." *Id.* at 197. In other words, the plaintiff did not state a claim for gross negligence.

Similarly, Plaintiff's allegations against Herbstreith are based on intentional conduct, not negligence. Herbstreith's alleged failure to warn Blowers or to refrain from using deadly force do not alter the intentional nature of his conduct. There are no allegations plausibly suggesting that Herbstreith's actions were anything other than intentional. Accordingly, the Court will dismiss Count IV against Herbstreith for failure to state a claim.

### 4. Count V: IIED

The Court's discussion of Herbstreith's governmental immunity to the assault and battery claim applies with equal force to Plaintiff's IIED claim against him. Thus, the Court will dismiss that claim as well.

### 5. Attorney's Fees and Costs - Mich. Comp. Laws § 600.2922b

Defendants argue that Herbstreith is entitled to his attorney's fees and costs because he acted in self-defense. Michigan law provides that an "individual" using deadly force "in self-defense or in defense of another" is "immune from civil liability for damages" arising from the use of that force. Mich. Comp. Laws § 600.2922b. In addition, the individual sued for civil damages for the use of that force is entitled to "actual attorney fees and costs" "if the court determines that the individual used deadly force . . . in compliance with section 2 of the self-defense act and that the individual is immune from civil liability under section 2922b." Mich. Comp. Laws § 600.2922c (footnotes omitted).

Section 2 of Michigan's self-defense act permits the use of deadly force, "with no duty to retreat," by "[a]n individual who has not or is not engaged in the commission of a crime" when that individual

24

> honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

Mich. Comp. Laws § 780.972.

Plaintiff responds that these rules were intended for criminal defendants, not police officers.  However, § 600.2922b expressly extends immunity to individuals sued in civil proceedings.  It is not limited to criminal defendants.

Plaintiff also argues that the statute does not apply to police officers.  Plaintiff notes that the self-defense statute altered the common law duty to retreat, which would not have applied to police officers in pursuit of a suspect.  However, nothing in the text of the statutes suggests that the term "individual" excludes police officers.  Thus, Plaintiff's arguments are not persuasive.

Nevertheless, Herbstreith's request for attorney's fees and costs will be denied at this juncture because his use of force is not conclusively established by the video evidence.  For purposes of the motion to dismiss, the Court has relied on Plaintiff's allegations to *assume* that Herbstreith was one of the first and last to fire on Blowers.  But the video does not show him doing so.  Thus, the Court cannot make a "finding" that Herbstreith actually used force in compliance with the self-defense act.

### B. Chief Blocker

#### 1. Count II:  § 1983

Defendants argue that the complaint fails to state a federal claim against Blocker because he is not mentioned in the factual allegations of the complaint and he was not involved in the shooting.  Plaintiff responds that Blocker is liable due to a failure to train the officers who were involved.

"[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in

some other way directly participated in it." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "Because § 1983 liability cannot be imposed under a theory of respondeat superior, proof of personal involvement is required for a supervisor to incur personal liability." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005). "'[A]t a minimum,' the plaintiff must show that the defendant 'at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee*, 199 F.3d at 300).

A supervisor's failure to train can, in some circumstances, amount to acquiescence in the misconduct of others, particularly when accompanied by a failure to investigate or a failure to discipline similar misconduct. *See Peatross*, 818 F.3d at 243. But there are no such allegations here. Indeed, apart from a conclusory assertion that Blocker and Hinckley were deliberately indifferent "to the constitutional rights of the public" (Compl. 2), Plaintiff's complaint contains no allegations mentioning Blocker at all. Although Blocker is mentioned as a defendant in the heading of Count II of the complaint, all of the allegations in that count are directed at the City of Battle Creek and the Board of Commissioners of Calhoun County. Those allegations are not sufficient to state a claim against Blocker. The Court of Appeals "'has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right.'" *Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) (quoting *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 564 (6th Cir. 2011)). Plaintiff has not met that standard. Thus, Plaintiff does not state a § 1983 claim against Blocker.

### 2. Counts IV, V

Plaintiff also claims that Defendant Blocker is liable for gross negligence and IIED. Defendants assert that he is entitled to governmental immunity for these claims.  Plaintiff agrees. (Pl.'s Response Br. 17.)  Accordingly, the Court will dismiss these claims against Blocker.

### C. City of Battle Creek

### 1. Count II:  § 1983

In Count II, Plaintiff claims that the City of Battle Creek is liable under § 1983 for maintaining a "custom, policy and practice" of deliberate indifference toward the rights of those with whom its police officers come into contact, contributing to the allegedly unlawful actions of Defendants Herson, Herbstreith, and Hatch.  (Compl. ¶¶ 36-37.)

A local government entity like the City of Battle Creek "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, a municipality may only be liable under § 1983 when its policy or custom causes the injury, regardless of the form of relief sought by the plaintiff.  *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35-37 (2010) (citing *Monell*, 436 U.S. at 694 (1974)).

In a municipal liability claim, the finding of a policy or custom is the initial determination to be made.  *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020); *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996).  The policy or custom must be the moving force behind the constitutional injury, and a plaintiff must identify the policy, connect the policy to the governmental entity and show that the particular injury was incurred because of the execution of that policy. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003); *Doe*, 103 F.3d at 508-09.

At the dismissal stage, a Plaintiff can demonstrate a policy or custom by alleging facts that show one of the following circumstances:

> "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."

*Lipman*, 974 F.3d at 747 (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

Here, Plaintiff alleges that the City, "as a matter of custom, policy and practice, . . . failed to adequately discipline, train, screen, supervise, transfer, counsel or otherwise direct or control police officers concerning the rights of citizens with mental disabilities with whom the police come into contact[.]"  (Compl. ¶ 37.)

For a claim based on a city's failure to train,

> a plaintiff "must establish that 1) the City's training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the City's deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury."

*Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019) (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)).

For a claim based on a city's failure to supervise, a plaintiff must show "'prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'"  *Wright v. City of Euclid*, 962 F.3d 852, 881 (6th Cir. 2020) (quoting *Burgess*, 735 F.3d at 478).

Plaintiff's claim is deficient for several reasons.  First, it alleges no facts from which to infer that the City maintained a custom, policy, or practice of inadequate training and supervision. The allegations of inadequate training and supervision are wholly conclusory.  For instance,

28

Plaintiff does not allege the existence of an official policy or of incidents involving the improper use of deadly force against a person with a mental disability.

Second, Plaintiff's allegations do not plausibly connect the allegedly inadequate training and supervision to the injury suffered by Blowers. There are no facts from which to infer that Defendants were aware that Blowers had a mental disability. Thus, there is no basis on which to conclude that additional training and supervision regarding interactions with mentally disabled individuals would have changed their treatment of Blowers.

In his response, Plaintiff cites evidence outside his complaint to support his claim; however, the issue before the Court is the adequacy of his complaint. That evidence is not relevant to Defendants' motion and it is not properly before the Court on a motion to dismiss.

Even if the Court were to consider the evidence, it would not save Plaintiff's claim. Plaintiff cites news articles referring to "three other shootings involving police that occurred in 2020" and that involved motorists or a "mentally challenged person." (*See* Pl.'s Response Br. 16.) He also mentions the dollar amount of the City's budget for training. Finally, he contends that the officers involved in this incident did not follow police policy requiring notice to a supervisor about a high-speed vehicle pursuit and about whether a suspect had been identified. (*Id.* at 16-17.) But none of the foregoing facts, even if they had been part of the complaint, would permit a plausible inference that the City had the alleged policy, custom, or practice of inadequate training or supervision, let alone that such inadequacies are connected to the specific injury suffered by Blowers. Plaintiff does not indicate how the officers could have known that Blowers had a mental disability. Accordingly, the Court will dismiss the City from Count II.

### 2. Count IV: Gross Negligence

Plaintiff apparently asserts that the City is liable for Herbstreith and Herson's gross negligence. As discussed above with respect to Officer Herbstreith, there are no allegations from

which to infer that any of the officers negligently fired upon Blowers.  Thus, the Court will dismiss the gross negligence claim against the City.

### 3. Count V:  IIED

Plaintiff also claims that the City is liable for its officers' IIED.  Defendants contend that Plaintiff does not state a claim for IIED, which has the following elements:

> (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff.

*Walsh v. Taylor*, 689 N.W.2d 506, 517 (Mich. Ct. App. 2004).  Among other things, Plaintiff does not allege severe emotional distress by Blowers.

Plaintiff offers no response; consequently, he has forfeited the issue.  *See Swanigan v. FCA US LLC*, 938 F.3d 779, 786 (6th Cir. 2019).  Accordingly, the Court will dismiss the IIED claim against the City.

### IV. CONCLUSION

For the reasons stated, the Court will partially grant Defendants' motion to dismiss.  The Court will grant the motion insofar as it seeks dismissal of the claims against Blocker, Herbstreith, and the City of Battle Creek.  The Court will not grant Herbstreith's request for an award of attorney's fees and costs.

An order will enter consistent with this Opinion.

Dated:   January 12, 2022                          /s/ Hala Y. Jarbou
                                                                    HALA Y. JARBOU
                                                                    UNITED STATES DISTRICT JUDGE